UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTY HUMPHREY,<br><br>                    Petitioner,<br><br>          vs.<br><br>WILLIAM LEE, Superintendent, Green<br>Haven Correctional Facility,<br><br>                    Respondent. | No. 9:07-cv-00283-JKS<br><br>ORDER<br>[Re: Motion at Docket No. 45] |

## I.  MOTION PRESENTED

Petitioner, Marty Humphrey, a state prisoner proceeding *pro se*, has timely moved under

Rule 59(e), Federal Rules of Civil Procedure, for reconsideration of the decision denying his

Petition for Habeas Corpus relief under 28 U.S.C. § 2254.  In his motion, Humphrey seeks

reconsideration of this Court's denial of relief based upon his seventh ground, ineffective

assistance of counsel, and denial of his motion for leave to file an amended petition.[1]  For the

reasons that follow, this Court finds no basis upon which to reverse its prior decision that the

seventh ground was procedurally barred.  Furthermore, even if this Court were to reach the merits

of Humphrey's seventh ground, Humphrey would not prevail.

---

[1] As noted in the Memorandum Decision, the proposed amended petition addresses solely the seventh ground.  Indeed, Humphrey acknowledges, in this motion, that in proposing his amended petition he intended to abandon the other six grounds raised in his Petition.

## II.  BACKGROUND[2]

Prior to trial, Humphrey, appearing through counsel, brought a *Huntley* motion to suppress incriminating statements Humphrey made to the police.[3]  That motion was denied. Subsequently, counsel who filed the *Huntley* motion was relieved and new counsel appointed.  In his seventh ground Humphrey argues that by failing to move to reopen the *Huntley* hearing his *second* trial counsel's performance was deficient.  Humphrey raised this claim in his post-conviction New York Criminal Procedure Law § 440.10 motion, which the Schenectady County Court denied under New York Criminal Procedure Law § 440.10[2].

In his response to the Petition in this Court, Respondent asserted that, because the state court denied the Humphrey's claim on adequate independent state grounds, his seventh ground was procedurally barred.  This Court agreed and denied Humphrey relief on that ground.

Nearly two years after he had filed his Traverse, Humphrey filed a motion for leave to file an amended petition, which this Court denied as untimely.

## III.  GROUNDS RAISED

Distilled to its essence, Humphrey's position is that this Court should have reviewed the state-law basis for the procedural default *de novo*.  More specifically, Humphrey argues that, in denying his § 440.10 motion, the Schenectady County Court misapplied § 440.10[2] as interpreted and applied by the New York Court of Appeals.  With respect to the denial of his motion for leave to file an amended petition, Humphrey's argument is essentially that this Court

---

[2] As the parties are thoroughly familiar with the background and prior proceedings in this case, they are briefly recapitulated only to the extent necessary to understand the current motion.

[3] *People v. Huntley*, 371 N.E.2d 794 (N.Y. 1977).  A shorthand reference to the procedure under New York law for seeking suppression of statements made to law enforcement officers.

should have applied the rule that a *pro se* litigant's pleadings are to be liberally construed and take into consideration his youth and incomplete education.

## IV.  LEGAL STANDARD

There are four basic grounds upon which a Rule 59(e) motion may be granted:  (1) to correct manifest errors of law or fact upon which the judgment is based; (2) to present newly discovered or previously unavailable evidence; (3) an intervening change in controlling law; or (4) to prevent manifest injustice.[4]  A Rule 59 motion may not be used to relitigate old matters, or to raise arguments that could have been raised, or present evidence that could have been presented, prior to the entry of judgment.[5]  The motion must specify the ground on which it is based.[6]  Humphrey cites no intervening change in controlling law, nor does Humphrey point to any controlling decision or evidence that the court overlooked.[7]  Thus, Humphrey's motion may be granted only if this Court committed a clear error of law or to prevent a manifest injustice.[8]

---

[4] *See generally* 11 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Fed. Prac. & Proc. Civ., § 2810.1 (2d ed. 2009).

[5] *Exxon Shipping Co. v. Baker*, 554 U.S. ___, 128 S.Ct. 2605, 2617 n.5 (2008) (citing and quoting 11 C. Wright & A. Miller, Fed. Prac. & Proc., § 2810.1, pp. 127-28 (2d ed. 1995)).

[6] *Motor Vehicle Mfrs. Ass'n of U.S. v. New York State Dept. of Environmental Conservation*, 831 F. Supp. 57, 60-61 (N.D.N.Y.), *aff'd in part and rev'd in part*, 17 F.3d 521 (2d Cir. 1993).

[7] *See Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

[8] *See Schwartz v. Liberty Mut. Ins. Co.*, 542 F.3d 135, 153 (2d Cir. 2008) (district courts may alter or amend a judgment "to correct a clear error of law or prevent manifest injustice.").

## V.  DISCUSSION

It does not appear that Humphrey contests that § 440.10[2] is a firmly established and regularly followed state procedural rule.  Indeed, that argument is foreclosed.[9]  In arguing for *de novo* review of whether the state courts properly applied § 440.10[2] to the facts of this case, Humphrey principally relies upon two exceptions to the general rule precluding review of a state court's interpretation of state law:  "exorbitant application" and "manipulation" of the rule.

> Ordinarily, violation of "firmly established and regularly followed" state rules—for example, those involved in this case—will be adequate to foreclose review of a federal claim.  *There are, however, exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question.*[10]

The Second Circuit has held:

> *Wainwright* [*v. Sykes*, 433 U.S. 72 (1977)] invoked the well-established principle of federalism that a state decision resting on an adequate foundation of state substantive law is immune from review in the federal courts.  *However, this immunity is not absolute, in either the substantive or the procedural context.  For it is equally well established that a state may not, in an attempt to deprive a litigant of the right to a hearing on a federal claim, manipulate its findings of law . . . or fact.  Thus, an unsupported or manipulative finding of procedural default would not constitute an adequate state ground barring federal habeas relief.*[11]

In denying Humphrey's § 440.10 motion, the Schenectady County Court held:

> Under CPL § 440.10(2)(c), the Court must deny a motion to vacate the judgment when there are sufficient facts in the record to allow adequate review of the issue on appeal but no such review occurred because the defendant unjustifiably failed to raise the issue.  [Humphrey's] direct appeal has been denied, and defendant unjustifiably failed to raise the issue of ineffective

---

[9] *Sweet v. Bennett*, 353 F.3d 135, 141 (2d Cir. 2003).

[10] *Lee v. Kemma*, 534 U.S. 362, 376 (2002) (as emphasized by Humphrey) (citations omitted); *see Garvey v. Duncan*, 485 F.3d 709, 713-14 (2d Cir. 2007).

[11] *Silverstein v. Henderson*, 706 F.2d 361, 367 n.11 (2d Cir. 1983) (as emphasized by Humphrey) (internal quotation marks and citations omitted).

4

assistance of counsel during that appeal.  Therefore, the Court denies [Humphrey's] ineffective assistance of counsel claim.

Pursuant to CPL § 440.10(2)(a), the Court must also deny a motion to vacate the judgment when the issue was previously determined on the merits upon an appeal from the judgment, unless there has been a retroactively effective change in the law controlling the issue.  On appeal, [Humphrey] raised the issue that the statement should have been suppressed because it was obtained by official trickery or deceit.  Even though the Third Department held that the issue was not preserved for appeal, the Court determined that there was "no evidence that [Humphrey] was isolated from family members as the result of any official deception."  People v Humphrey, 15 AD3d 683, 685 (3d Dept 2005) relying on People v Salaam, 83 NY2d 51, 55 [1993]; People v Dearstyne, 230 AD2d 953, 958 [1996], lvs [sic] denied 89 NY2d 921 [1996], 89 NY2d 1034 [1997]).  Since this issue has already been determined on direct appeal and there has been no subsequent change in the law this part of [Humphrey's] motion must also be denied.

It should also be noted that suppression of [Humphrey's] statement would not have changed the outcome of the trial.  [Humphrey's] trial testimony was consistent with the statement he had given to the police.  Even if [Humphrey] were correct in his argument that the statement should have been suppressed, such error would have been harmless.[12]

In his direct appeal, Humphrey argued:

The defendant's confession should be suppressed because the police used deception and trickery to seal off the most likely means for Humphrey to reach assistance of counsel.  In the case People v. Townsend, 33 NY2d 37, 347 NY2d 187 (1973), court said that it is impermissible for the police to use a confession, even if it be otherwise voluntary, obtained from a 17 year old when in the course of extracting such confession they have sealed off the most likely avenue by which the assistance of counsel by means of deception or trickery.

In our case, sixteen year old Marty Humphrey was brought down to the police station and although he was told that he could speak with his sister, he was not offered an opportunity to speak with his mother or uncle.  (A32, A84)  In fact, Marty Humphrey states on the record that his uncle was told that he could not come into the police station with the defendant.  (A32)  It is obvious that the police would only permit Mr. Humphrey to speak with his young sister who in her youth did not encourage her brother to request an attorney.  (A28, A39)  In the record, Detective McHugh told Marty Humphrey in the police station that they had made arrangements for his sister to come down and see him.  (A40).  When asked by defense attorney, Mike Jurena, if Detective McHugh had tried to contact

---

[12] Docket No. 14-14.

Marty Humphrey's mother, McHugh responded that "Marty Humphrey's mother was not specifically told she would be afforded the opportunity to speak with her son prior to an interview." (A41).  In fact, Marty's mother never spoke to her son prior to Humphrey giving the police a statement.  The police reconciled this with saying that it was their understanding that the "sister and Marty were closer than Marty and the mother" (A41).  On the record Kim Humphrey states that she was present when the police told their mother that Marty did not want to see his mother.  (A8S)  In the Huntley Hearing, the detective states that he never even asked Marty Humphrey if he wanted his mother present. (A84).  The Schenectady Police tricked Marty Humphrey into confessing without an attorney present.  Telling Humphrey's mother that her son did not want to speak with her was a lie.  This is the deceit that was used to conceal the means by which Marty Humphrey was most likely to assert his constitutional right to representation.  The confession should not have been allowed to be used at trial.  This is reversible error.[13]

The Appellate Division, Third Department, rejected Humphrey's argument, holding:

> Next, defendant argues, for the first time on appeal, that his confession to police should have been suppressed because the police used deception and trickery to keep him from contacting his family and possibly seeking the aid of counsel.  Were we to consider the issue despite his failure to preserve it, we would find that there is no evidence that defendant was isolated from family members as the result of any official deception.[14]

Upon thorough review of the motion and accepting Humphrey's factual contentions, but not his conclusions, this Court finds nothing "exorbitant" about the application of § 440.10[2] to the facts in this case.  Nor does it appear that the finding of a procedural default by the Schenectady County Court was unsupported by, or manipulative of, the facts.  In short, Humphrey has fallen far short of establishing that the prior decision of this Court was clearly erroneous or, as demonstrated by the following discussion on the merits, that it resulted in a fundamental miscarriage of justice.

---

[13] Docket No. 14-4, pp. 11-12.

[14] *People v. Humphrey*, 789 N.Y.S.2d 325, 328 (N.Y.A.D), *lv. denied*, 834 N.E.2d 1267 (N.Y. 2005).

Even if this Court were to reach the merits of his ineffective trial counsel claim, Humphrey would not prevail.  If a federal claim has not been adjudicated on the merits, Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) deference is not necessarily required.[15]  In that situation, conclusions of law and mixed questions of fact and conclusions of law are reviewed *de novo*.[16]  Where there is no reasoned decision of the state court addressing the ground or grounds raised on the merits and no independent state grounds exist for not addressing those grounds, this Court must decide the issues *de novo* on the record before it.[17]  In so doing, because it is not clear that it did not so do, the Court assumes that the state court decided the claim adverse to the petitioner on the merits and the decision rested on federal grounds.[18]  This Court gives the assumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court.[19]

Under *Strickland,* to demonstrate ineffective assistance of counsel, Humphrey must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.[20]  A deficient performance is one in which counsel made errors so serious that

---

[15] *Miranda v. Bennett*, 322 F.3d 171, 178 (2d Cir. 2003).

[16] *DeBerry v. Portuondo*, 403 F.3d 57, 67 (2d Cir. 2005).

[17] *See Dolphy v. Mantello*, 552 F.3d 236, 239-40 (2d Cir. 2009) (citing *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)); *cf. Wiggins v. Smith*, 539 U.S. 510, 530-31 (2003) (applying a *de novo* standard to a federal claim not reached by the state court).

[18] *Harris v. Reed*, 489 U.S. 255, 263 (1989); *Coleman v. Thompson*, 501 U.S. 722, 740 (1991); *see Jimenez v. Walker*, 458 F.3d 130, 140 (2d Cir. 2006) (explaining the *Harris-Coleman* interplay); *see also Fama v. Comm'r of Correctional Svcs.*, 235 F.3d 804, 810-11 (2d Cir. 2000) (same).

[19] *Jimenez*, 458 F.3d at 145-46.

[20] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

counsel was not functioning as the counsel guaranteed by the Sixth Amendment.[21]  Humphrey must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.[22]  An analysis that focuses "solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective."[23]  *Strickland* and its progeny do not mandate this Court act as a "Monday morning quarterback" in reviewing tactical decisions.[24]  Indeed, the Supreme Court admonished in *Strickland*:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

---

[21] *Id.*

[22] *Woodford v. Visciotti*, 537 U.S. 19, 22-23 (2002);  *Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

[23] *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *see Strickland*, 466 U.S. at 687; *see also Kimmel v. Morrison*, 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect"); *United States v. Cronic*, 466 U.S. 648, 258 (1984) ("the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.  Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.").

[24] *See Harris v. Reed*, 894 F.2d 871, 877 (7th Cir. 1990).

There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.[25]

In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro, supra,* at 473, 127 S.Ct. 1933.  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.  See *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").[26]

It is through this doubly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d)(1) standard.[27]

Humphrey's arguments is two-fold.  First, Humphrey contends that there are inconsistencies between the testimony of Detective McHugh at the initial *Huntley* hearing and the testimony of Detectives McHugh and Kutil at trial that casts doubt upon their credibility.  Second, Humphrey points to information concerning an alleged telephone call by an attorney to the Schenectady Police Department that came to light during the trial and was discussed on the record.  According to Humphrey, his second trial counsel should have renewed the *Huntley* motion and by failing to do so his representation was rendered ineffective.

At the *Huntley* hearing, Detective McHugh testified as follows on direct examination:

---

[25] *Strickland*, 466 U.S. at 689 (internal citations and quotation marks omitted).

[26] *Knowles v. Mirzayance*, 556 U.S. ___, 129 S. Ct.1411, 1420 (2009).

[27] *See id.* (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

9

BY MR. MUELLER:

    Q      Did Kim Humphrey come down to the station?

    A      Yes, she did.

    Q      Was she allowed to go in and see her brother?

    A      Yes.

    Q      Had Marty Humphrey made any requests to talk to any family members?

    A      No.  I believe I told Mr. Humphrey that I had his sister en route to come speak with him.[28]

On cross-examination by Humphrey's counsel, Detective McHugh testified:

    Q      Identified yourself as a police officer?

    A      Yes.

    Q      How did you do that?

    A      I said, Hi, Marty. My name is Detective McHugh.  I'll be in to talk to you in a little while.  Your sister we're making arrangements for your sister to come down and see you.

    Q      That was something you arranged with his sister that morning, is that right?

    A      No.  That's an agreement I had with his sister over the past several days, that when we finally met Mr. Humphrey that she would be afforded the opportunity to speak with him prior to any interview.

    Q      How many times had you spoken to his sister prior to him turning himself in?

    MR. MUELLER:      Objection.  Relevance.

    THE COURT:      Sustained.

    Q      So you had spoken to her, though, right?

    A.      Certainly.

    Q      You had spoken to my client's mother also, right?

    A      Yes.

    Q      You didn't tell her that you would let her know when he was brought in, did you?

    MR. MUELLER:      Objection.  Relevance.

    THE COURT:      Overruled.

    A      They were -- Mrs. -- Marty's mother was not specifically told she would be afforded the opportunity to speak with her son prior to an interview but his sister was.

    Q      Why the sister and not the mother?

---

[28] Docket No. 15-1, p. 125.

A        It was our understanding that the sister and Marty were closer than Marty and the mother.[29]

* * * *

Q.        Did you ask him if he wanted his mother present?

A.        Did I ask him if he wanted his mother?

Q.        Yes.

A.        No.[30]

At trial, Detective Kutil, who did not testify at the *Huntley* hearing, testified on direct examination:

Q.        What happened then?

A        After I spoke to Mr. McHugh on the phone -- or Detective McHugh -- he called me back, asked me if I wanted him to stop at Yates Village, pick up the mother and the sister.

Q.        If you wanted him to stop there?

A.        Yes.

Q.        Why?

A.        Because earlier in the investigation --

MR. BROWNELL:    Objection, your Honor.

MR. MUELLER:  Not offered for the truth, your Honor.  It's background.

A        Because earlier in the investigation while we were interviewing the mother and sister in attempting to find Mr. Humphrey we told them they would have time to speak to him before we spoke to him.

THE COURT:  Overruled.

Q        In particular who wanted to speak with him?

A        The sister.

Q        So, McHugh reminded you of that and asked if you wanted him to pick them up?

A        Yes, he did.

* * * *

Q        So, what happened then?

A        I was busy doing paperwork. Detective McHugh came in and he went in, introduced himself, and then the family responded to the station a short time after.

Q        By family, do you recall who came?

A        The mother and the sister.

_____

[29] Docket No. 15-1, pp. 166-67.

[30] Docket No. 15-1, p. 173.

> Q      And after Investigator McHugh had introduced himself and the
> family arrived, what happened?  What happened?
>
> A      McHugh took, he took control of the situation there because he was
> the lead investigator and advised Kim she was able to go in and speak to him.
>
> Q      Did she do that?
>
> A      Yes, she did.[31]

At trial, Detective McHugh testified on direct examination:

> Q      What did you do?
>
> A      I got in my truck and came down to the station.
>
> Q      And what happened when you got down there?
>
> A      Mr. Humphrey was sitting in the interview room, and prior to his
> arrival I had made arrangements with his sister Kimberli, I told her that we would
> allow her to speak with Marty before he was interviewed.  She was helpful with
> us throughout the investigation and she was very concerned for her brother, so we
> said, listen, before we even talk to him you can go in and spend a few minutes
> with him; just, you know, we didn't ask her to tell him anything, we just said
> listen, just go in and spend some time with your brother.[32]
>                                    *   *   *   *
> Q      Now, his sister was at the station. She talked to him.  Did his
> mother come down as well?
>
> A.      I believe his mother did come down.
>
> Q      Did you ever talk to Marty about his mother?
>
> A      Yes.
>
> Q      At what point?
>
> A      I believe it was before we started our interview. I said, "Your sister
> is here, your mother is here.  Do you want to speak with her?"  He said, "No".
>
> Q      Based on your discussions prior to that with Kim Humphrey, did
> you have an understanding as to who he was closer to or more likely to confide
> in?
>
> A      Yes, Kim had told me that she and Marty were closer than Marty
> and his mom.[33]

On cross-examination, Detective McHugh testified:

> Q      And Mr. Humphrey obviously was already at the station when you
> arrived?

---

[31] Docket No. 15-5, pp. 24-26.

[32] Docket No. 15-5, p. 63.

[33] Docket No. 15-5, p. 67.

A       Yes, he was.
Q       Was his sister Kim there?
A       I don't think she had arrived yet.
Q       So, she arrived at some point after you arrived?
A       Just after I did.
Q       And you allowed Kim to spend some time with her brother?
A       Yes.
Q       And then did she leave at that point?
A       No.
Q       No?
A       No.
Q       She remained at the station?
A       It was part of our agreement.  I was going to let Kim speak with Marty before we interviewed him, and we had made an agreement that she would give either myself or Detective Kutil an affidavit as to what she had told us Marty had told her before we interviewed her the first time.[34]

Humphrey also refers to a point during the trial when the issue of whether an attorney had contacted the Schenectady Police Department on Humphrey's behalf requesting that Humphrey not be further questioned in the attorney's absence.

MR. MUELLER:       I would like to make a record that I would like a longer lunch hour.
Your Honor, at the end of the first part of our session today, when we broke for a few minutes, kept the jury waiting, I went up and talked to the D.A. and talked to Bill Sanderson, an attorney with our office, and asked if one of them would try to reach out for Paul Delorenzo in view of the discussions that Mr. Brownell and I had had in which Mr. Brownell advised me that he had been informed by a member of Mr. Humphrey's family, his sister or mother, that she had been informed that someone on behalf of Mr. Humphrey, whose identity was not indicated, had reached out for Attorney Paul Delorenzo on the evening that Mr. Humphrey surrendered himself to the police -- that would be December 2nd of last year -- and spoken with that attorney, and that Attorney Delorenzo had made a call to the Schenectady Police Department advising them or requesting that they not talk to Mr. Humphrey.  The time of that call, who it was made to, and other salient details were not part of the information I think that Mr. Brownell received and passed on to me.
The investigators in this case, Ken Kutil and Robert McHugh, know nothing of that, of any such call, and I haven't, prior to what Mr. Brownell said,

---

[34] Docket No. 15-5, pp. 138-39.

13

received any indication whatsoever that any such call was made, but we contacted Mr. Delorenzo today in response to Mr. Brownell's information.  Mr. Sanderson talked to him, and when they first talked, Mr. Delorenzo acknowledged that he had had a conversation with Mr. Brownell about that matter and said that he recalled that sometime back then -- he didn't remember the date, but that it was a Saturday, which apparently is consistent with December 2nd -- he was out for the evening and called in to his office apparently and checked his messages and had a message on his phone, he believed from Marva Robinson, who is at least a friend -- I don't know whether she is actually related to Mr. Humphrey -- and he returned that call at some point, he wasn't specific about when, by cell phone, and he believes he spoke to Marva Robinson and he may also have spoken to Mr. Humphrey's mother, though I think he was less certain of this, and talked to them about the concept of felony murder, in which he was informed by the caller, the person that he spoke to, that Mr. Humphrey had been present, but, in their words, didn't do anything at these events.  So, he discussed that concept with them.

Mr. Delorenzo did not recall in talking to Mr. Sanderson that he had made any phone call on Mr. Humphrey's behalf or on behalf of the family or anyone to the Schenectady Police.  He did not have a definite recollection that he didn't, but he did not recall making one.  What he said is that he would check his computer files, because had he made a phone call, he said he would have made a file reflecting it.  He spoke to Mr. Sanderson again just a few minutes ago and indicated that he had checked his computer files and found no file or record relating to this matter, Mr. Humphrey or the call with Marva Robinson, and believed that was consistent with his lack of any recollection of making a phone call to the police department.

We asked him if he would be willing to come in and give an affidavit to that effect.  He said he had clients coming in all afternoon, but if we would send him an affidavit to that effect, he would look at it, mark it up, if needed to be changed, send it back to us, or sign it if it was correct.  That's the status.

MR. BROWNELL:     Judge, as I indicated this morning, I haven't heard anything to the contrary since, and obviously this is a potential issue that needed to be addressed.  As I said, I haven't heard anything to the contrary of what Mr. Mueller has represented to the Court.  At this point in time it doesn't seem to be an issue.  If that should change, obviously I would advise the Court, but I don't think it's going to be an issue.

MR. MUELLER:     And I think perhaps we should also put on the record that, as I understand it, Mr. Brownell knew nothing about this matter until really last week, I think, when someone approached him as Officer McHugh was in the process of testifying, and also that Mr. Jurena, who was Mr. Humphrey's attorney before Mr. Brownell, knew nothing whatsoever about this matter at the time that he went through the Huntley hearing and even today.

MR. BROWNELL:     That's correct, your Honor.  I knew nothing about this at all until during a break in the testimony of Investigator McHugh last week, and I did speak with Mr. Jurena this morning because, obviously, this would have

14

been something important for him to know, if in fact it had occurred, and he knew nothing of this either.

MR. MUELLER:     So, based on all of that, your Honor, it's the People's position that this was basically a non-issue that was raised to Mr. Brownell.  He did the right thing and came forward with it.  We have investigated it.  There doesn't appear to be anything to it, and once we receive whatever affidavit Mr. Delorenzo provides, we'll provide that to Mr. Brownell as well.

THE COURT:     Okay.  And Mr. Brownell, you have undertaken to have somebody on the defendant's behalf yourself contact Mr. Delorenzo as well?

MR. BROWNELL:     That is correct, your Honor.  I don't believe it has happened as of yet.  I did speak to an investigator earlier today who was going to attempt to get a statement from Mr. Delorenzo, and I believe that's taking place at some point this afternoon.

THE COURT:     Let's just proceed with the trial as per the plan, and if something materializes that causes us to have to readdress the issue, then we will, obviously; and if not, then I think the record is complete as far as it stands.  Okay, let's take five minutes and see if the jury is here, and then we'll continue.[35]

In its ruling on the *Huntley* motion, the Schenectady County Court made several findings of fact, summarized as follows:

1.     Humphrey, at the urging of his family, voluntarily appeared at the Schenectady County Police Department.  Humphrey was escorted unrestrained to an unlocked interview room and was joined shortly thereafter by Officer McHugh.

2.     Upon learning that Humphrey's sister had arrived at the station to speak with Humphrey, McHugh excused himself.  Humphrey and his sister spoke for approximately fifteen minutes, then Humphrey's sister left.

3.     Officer McHugh reentered the room.  After first determining that Humphrey could read and write English and express himself, Mc Hugh proceeded to advise Humphrey of his rights.  Through initialization of the *Miranda* form, Humphrey indicated that he understood each and all of the rights that were read to him.

---

[35] Docket No. 15-5, pp. 366-71.

15

4.     McHugh and Humphrey then began a conversation and Humphrey admitted participating in both robberies.  Before proceeding, however, McHugh offered Humphrey dinner.  Humphrey ordered Chinese food and was left alone to eat.

5.     Some thirty-five minutes later, McHugh returned to the room, and he and Humphrey resumed their conversation.  Humphrey agreed with McHugh's suggestion that Humphrey put his statement in writing.  Over the next hour, McHugh transcribed Humphrey's affidavit.  Humphrey reviewed the statement, made several corrections, initialed them, and then signed the bottom of each page of the statement.  Humphrey then told McHugh, "that's my story, that's what happened."

6.     Over the next 25 minutes, Humphrey alone handwrote and signed a one-page written statement.  Humphrey was then shown five photographs; Humphrey indicated that the photos were of baseball bats from his home that were used to kill Noorzai.

7.     At no time did Humphrey express discomfort, pain, fatigue, or impairment by drugs or alcohol. Humphrey never indicated that he had a lawyer or that he wanted one.

8.     Humphrey had no trouble understanding McHugh, was not subjected to threats, nor was Humphrey promised anything by McHugh or anyone else.[36]

The only potential inconsistency or contradiction between the testimony of Detective McHugh at the *Huntley* hearing and the trial testimony is with respect to Detective McHugh's conversations with Humphrey concerning contact with Humphrey's mother.  At the *Huntley* hearing, the question posed to Detective McHugh was whether Humphrey was asked if he wanted his mother *present*, to which McHugh responded no.  At trial Detective McHugh testified

---

[36] Docket No. 14-6, pp. 50-53.

he asked Humphrey if he wanted to *speak to* his mother.  While, as the questions are precisely worded, there is no inconsistency, this Court agrees that a person might consider them somewhat inconsistent.  With respect to the information concerning a call from the attorney advising the police not to further question Humphrey, not only is there no evidence in the record before this Court that any such telephone call occurred, Humphrey does not even contend that it did.  Humphrey simply argues that, based upon the inconsistencies that he contends undermines the credibility of Detectives McHugh and Kutil and the information concerning an unsubstantiated contention that an attorney had called the police, counsel should have renewed the *Huntley* motion.[37]

Assuming, *arguendo*, that Humphrey's second trial counsel was deficient in failing to renew the *Huntley* motion, satisfying the first prong of *Strickland-Hill*, Humphrey fails to satisfy the second prong, prejudice.  In order to prevail on his ineffective counsel argument, Humphrey must establish a reasonable probability that, had trial counsel renewed the *Huntley* motion, the outcome would have been favorable, *i.e.*, the renewed motion granted.  Humphrey's argument before both the state courts in his § 440.10 motion and this Court that counsel was ineffective in failing to renew the *Huntley* motion is based upon essentially the same set of operative facts as was his argument on direct appeal that his statement should have been suppressed.  That is, based upon those facts, his trial counsel was ineffective for failing to renew the *Huntley* motion before

---

[37] Humphrey also presented evidence in his § 440.10 motion that his relatives intent in accompanying him to the police station was to provide Humphrey support and protect his rights and safety, and that they were making efforts to obtain legal representation for him.  There is, however, no evidence in the record that, although they apparently did contact an attorney on his behalf, that they did, in fact, obtain representation.  Furthermore, there is no support in either federal or New York law that even a juvenile is entitled to have a "entourage" of relatives present during police interrogation.

the trial court.  The Appellate Division rejected Humphrey's argument that his statement should

have been suppressed, specifically finding as an alternative to the procedural bar a lack of

"trickery or deception."  This, standing alone, is strongly indicative that a renewed *Huntley*

motion, on the facts as known to counsel at the time of trial, would not have resulted in a

decision favorable to Humphrey.

Humphrey posits the merits of his argument concerning the admissibility on the holding

of the New York Court of Appeals in *Townsend* that "it is impermissible for the police to use a

confession, even if it be otherwise voluntary, obtained from a 17-year-old defendant when, in the

course of extracting such confession, they have sealed off the most likely avenue by which the

assistance of counsel may reach him by means of deception and trickery."[38]  The facts in this case

differ materially from those in *Townsend*.  There, the mother of a 17-year-old defendant tried

repeatedly to reach her son while he was in custody.  Each of her telephone calls, however, was

met with police denials that her son was in custody, while, in fact, he was not only in custody,

but confessing to the crime.  Here, the sole alleged deception is that the police told Humphrey's

mother that Humphrey did not want to talk to her.[39]  In *Townsend*, the confession also followed

on the heels of three inadmissible statements and was the product of a continuous stream of

---

[38] *People v. Townsend*, 300 N.E.2d 722, 724 (N.Y. 1973).

[39] This Court notes that, although Humphrey denies that he told the detectives involved that he did not want to see his mother, Humphrey does not contend that he ever told a detective, or his sister when she talked to Humphrey, that he wanted to speak to his mother or any other family member.  It also appears that, although other family members, *e.g.*, aunt, uncle, grandparent, asked to see Humphrey and were refused, again there is no allegation that Humphrey requested he be allowed to talk to any family member other than his sister.  There is no authority under either federal or New York law that, under this factual scenario, a confession would be deemed involuntary.

interrogation, a factor the New York Court of Appeals found substantially supported its determination.  Here, the state courts found that Humphrey voluntarily appeared at the police station, was given *Miranda* warnings and he waived his rights intelligently and voluntarily prior to being questioned about his involvement in the crime.  The state courts further found that there was no deception or other deliberate attempt on the part of the police to isolate Humphrey from his mother in order to deprive him of the assistance of counsel or to obtain a confession.  These findings are supported by the record; therefore, this Court is bound by them unless controverted by clear and convincing evidence.[40]  Under this factual scenario, there is not only no reasonable probability that a renewed *Huntley* motion would have been granted, it is highly unlikely.[41]

This Court cannot say that the assumed decision of the Schenectady County Court denying Humphrey's § 440.10 motion on the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[42]  Nor, viewing the matter through the doubly-deferential lens of *Mirzayance*, can this Court find that the assumed decision of the state court unreasonably applied the correct legal principle to the facts of Humphrey's case within the scope

---

[40] 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

[41] *People v. Winchell*, 476 N.E.2d 329, 329-30 (N.Y. 1985) (memorandum); *see People v. Sticht.*, 641 N.Y.S.2d 146, 147 (N.Y.A.D.), *lv. denied*, 672 N.E.2d 628 (N.Y. 1996 (Table); *cf People v. Bevilacqua*, 382 N.E.2d 1326, 1328-29 (N.Y. 1978) (in a case involving an 18-year old, the Court of Appeals, questioning whether where, as here, after being given the proper *Miranda* warnings the defendant had waived counsel, ignoring the defendant's request to speak to his mother, standing alone, fit within *Townsend*, relied on the fact that the police also ignored the telephonic request of the defendant's counsel that interrogation be ceased until counsel was present).

[42] 28 U.S.C. § 2254(d).

of *Andrade-Williams-Schriro*; *i.e.*, the assumed state court decision was more than incorrect or erroneous, its application of clearly established law was objectively unreasonable.  Humphrey has failed to establish that counsel committed any error that was so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment or that Humphrey's defense was prejudiced, as required by *Strickland-Hill*.  Thus, even if considered on the merits, Humphrey is not entitled to relief under his seventh ground.

## VI.  CONCLUSION AND ORDER

Humphrey is not entitled to reconsideration of the denial of his petition for habeas corpus relief.

**IT IS ORDERED THAT** the motion for reconsideration at Docket no. 45 is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.[43]  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.[44]

Dated:  April 29, 2010.

                      /s/ James K. Singleton, Jr.        
                      JAMES K. SINGLETON, JR.
                      United States District Judge

---

[43] 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) ("reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further") (internal quotation marks omitted).

[44] *See* Fed. R. App. P. 22(b); Second Circuit R. 22.